In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3951

ANTHONY MONTGOMERY,

*Plaintiff-Appellant,*

*v.*

AMERICAN AIRLINES, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5924—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 8, 2010—DECIDED NOVEMBER 19, 2010

Before EASTERBROOK, *Chief Judge,* and BAUER and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Anthony Montgomery sued his employer, American Airlines, Incorporated ("American"), alleging two civil rights violations relating to his race. First, Montgomery claimed that American allowed a hostile work environment to persist in a maintenance shop to which he was briefly assigned as a probationary employee. Second, he claimed that his demotion at the

end of his probationary period was an adverse action motivated by racial discrimination. After discovery, American Airlines moved for summary judgment. The district court granted summary judgment in favor of American on all counts, and Montgomery timely appealed. Because the record on appeal supports summary judgment in favor of American, we will affirm the decision below.

## I. BACKGROUND

Montgomery began working for American in December 1989 as a Fleet Service Clerk at O'Hare International Airport; he is still employed by American in that position. The events leading to this suit occurred during Montgomery's five-month stint as a probationary mechanic in American's Automotive Shop ("Auto Shop") at O'Hare. Montgomery is and—at all times relevant to this suit—was a member of the Transport Workers Union of America AFL-CIO ("TWU").

### A. The Probationary Period

Montgomery requested a transfer into the Auto Shop as a ground support equipment mechanic in the fall of 2006. After vetting his application for sufficient experience, education, or training, American granted Montgomery's request. Montgomery began his probationary period on December 9, 2006.

The collective bargaining agreement ("CBA") between American and the TWU established the probationary

period and its qualification requirements. On his first day, a supervisor met with Montgomery and explained the on-the-job training and familiarization Montgomery would undergo during his probationary period. The supervisor further explained that Montgomery needed to pass a tool inspection and a qualification test near the end of the period in order to remain in the Auto Shop. The CBA also required that probationary employees become regular mechanics if they are not given the qualification test within 180 days of starting in the Auto Shop.

Montgomery was one of only three African-Americans working in the Auto Shop during his probationary period. The two others—Clifton Shay (supervisor) and Dwain Wooley (a crew chief and union representative)—did not work on the Auto Shop floor with Montgomery during his shifts. Montgomery allegedly began experiencing harassment and hostility from mechanics and crew chiefs soon after beginning his probationary period. Montgomery concluded that their actions resulted from his race, though it appears he never articulated that belief to his supervisors during his probationary period.

Montgomery worked with three other probationary mechanics—Tim Nguyen, Bill Romano, and Dave Hilt—at some point during his probationary period. Their probationary periods did not wholly coincide with his own. Because Montgomery believed that, in contrast to him, they did not have to take and pass the qualification test at the end of their probationary periods, he complained

to Brian Schaefer in late February or early March 2007. Schaefer had been named as Manager of Ground Operations, a position that had been unfilled since December 2005, shortly after Montgomery had commenced his probationary period. Montgomery told Schaefer that he felt it was unfair and racially discriminatory that he had to take the exam; he also notified Schaefer of other issues that he noticed in the shop, including other mechanics sleeping on duty and some supervisors being delinquent. Schaefer answered that the CBA required all probationary mechanics to take the exam and that, under his new management, the CBA's requirements would be strictly observed. Schaefer investigated Montgomery's other allegations, resulting in some policy changes and the resignation of one of the supervisors Montgomery had identified. Montgomery has further alleged that he also discussed at this meeting the racial harassment he was experiencing.

Auto Shop supervisor Richard Helton administered Montgomery's qualification test on April 7, 2007. Helton was assisted by Tim Wells (another supervisor) and was observed by Joe Pacenti (Montgomery's TWU representative). Montgomery was not acquainted with Helton before the date of the exam. At one point, Montgomery improperly performed a temporary repair on a vehicle tire—after lifting the vehicle not in accordance with known safety standards—when he had been asked to perform a permanent repair. He did not demonstrate his familiarity with a trouble-shooting procedure by identifying the steps involved. He did demonstrate a degree of unfamiliarity with parts manuals by flipping

through them page-by-page instead of using their cross-referenced indices. Helton, after consulting with Wells, determined that Montgomery had failed the qualifying test. Pacenti agreed that the test had been fairly administered.

Due to his failure of the exam, American removed Montgomery from his probationary position in the Auto Shop. He returned to his original position as a Fleet Service Clerk on or about April 26, 2007.

### B. *Montgomery's Complaints to Human Resources*

Montgomery had no further contact with coworkers or supervisors from the Auto Shop, and he did not pursue any of his allegations of racial harassment and discrimination until he contacted Customer Service Manager Sonji Nicholas on August 8, 2007. Nicholas directed Montgomery to contact Human Resources or American's hotline, as indicated in American's published policies against racial discrimination and harassment. Nicholas also informed Human Resources Representative Jacqueline Rios of Montgomery's communication.

Rios waited two days for Montgomery to contact her. When he did not, she sought him out to inquire about his concerns. Rios and Montgomery talked for approximately three hours in their initial meeting on Friday, August 10, 2007. In this meeting, Montgomery never indicated that he had complained about racially-motivated harassment and discrimination to his supervisors, even in the written statement he prepared for Rios containing

all of his allegations. Rios then met again with Montgomery on Monday, August 13, and on the following Thursday to clarify her understanding of his allegations.

Rios initiated an investigation into Montgomery's allegations immediately following these meetings. She reviewed pertinent documents and interviewed numerous witnesses to the incidents Montgomery alleged—including union representative Pacenti, crew chief Frank Dlugopolski, mechanic Wooley, supervisors Shay and Helton, and manager Schaefer. At the conclusion of her investigation, Rios was unable to substantiate Montgomery's claims.

Rios determined that Montgomery had simply failed his qualification test and tool inspection and that both were administered fairly. She concluded that only two probationary mechanics were made regular Auto Shop employees without passing the qualification test: (1) Nguyen, at a time before Schaefer assumed management responsibility over the Auto Shop, and (2) Romano, whose testing was precluded by the CBA when his seniority date was adjusted pursuant to a union argument regarding his rehiring after a previous reduction in force. Rios also determined that some mechanics claimed their aversion to working with Montgomery was based on his work performance, not upon his race. Finally, Rios determined that mechanic Mike Kogal had made a comment to Montgomery that was inappropriate for the workplace—"I didn't know it was you until you smiled"—even though Kogal maintained that, because of his friendship with Montgomery, Montgomery understood the comment referred to an inside joke be-

tween the two. Based on Rios's finding, Schaefer counseled Kogal about the comment and his behavior toward co-workers.

At the conclusion of her investigation, Rios met again with Montgomery on October 8, 2007, to inform him that she was preparing a summary of her investigation and findings. He made no further comments to Rios.

### C. *Procedural History*

Montgomery filed a charge of discrimination against American with the Equal Employment Opportunity Commission (EEOC) on October 2, 2007. After receiving a Notice of Right to Sue from the EEOC, Montgomery filed suit in the United States District Court for the Northern District of Illinois. His complaint comprised four counts. In Counts I and II, Montgomery alleged that the racial harassment and the hostile work environment to which he was subjected violated 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, respectively. In Counts III and IV, Montgomery alleged that his demotion to the Fleet Service Clerk position was an adverse action resulting from racial discrimination in violation of § 1981 and Title VII, respectively.

Following discovery, American moved for summary judgment on all counts. The district court found Montgomery had not demonstrated that a genuine issue of material fact existed as to whether the conduct alleged in Counts I and II could be attributed to American as his employer. It further found Montgomery neither presented

a prima facie case of racial discrimination in Counts III and IV nor showed that a genuine issue of material fact existed as to whether American's proffered reason for his demotion was a pretext for discrimination. Accordingly, the district court granted summary judgment in favor of American on each of Montgomery's counts. Montgomery timely appealed the court's entry of final judgment for American.

## II. ANALYSIS

### A. Standard of Review

The only issue presented by this appeal is whether the district court erred in granting summary judgment in favor of American on all four of Montgomery's counts. We review grants of summary judgment *de novo*, *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 690 (7th Cir. 2010), viewing the record in the light most favorable to Montgomery and drawing all reasonable inferences in his favor to determine if there is a genuine issue of material fact as to any element of his claims, *McCann v. Iroquois Mem'l Hosp.*, ___ F.3d ___, 2010 WL 3528849, at *5 (7th Cir. Sept. 13, 2010). We have previously held that "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). Further, disputed facts that are not outcome-determinative are not material and will not preclude summary judgment. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).

We pause to point out, however, that before Montgomery can benefit from a favorable view of evidence, he must first actually place evidence before the courts. He must "make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial." *Severn*, 129 F.3d at 425. In *Berry* we held that uncorroborated, self-serving testimony, "[i]f based on personal knowledge or firsthand experience," may prevent summary judgment against the non-moving party, as "such testimony can be evidence of disputed material facts." *Berry*, 618 F.3d at 691. But mere conclusory allegations do not constitute evidence. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003).

We turn now to Montgomery's claims, taking his two theories of recovery in turn. Montgomery brings functionally identical claims of racial harassment in Counts I and II, only differing in the statute he invokes. The same is true of the racial discrimination he claims in Counts III and IV. Because Montgomery does not differentiate the operative facts based upon the statute invoked, and because the elements of his claims and the methods of proof are essentially identical under either statute, our analysis will apply equally to his claims under § 1981 and Title VII. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

### B. Hostile Work Environment

Montgomery claims he was subjected to a hostile work environment in the Auto Shop due to harassment he

suffered based on his race. To stave off summary judgment, Montgomery must have provided sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) his race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010). American contends that Montgomery presented insufficient evidence to allow a jury to find in his favor as to any of the four elements. The record on appeal is far from conclusive as to the elements of objective offensiveness, causation, and severity, but by reviewing the record in the light most favorable to Montgomery,[1] and by taking all reasonable inferences in his favor, we determine that he has presented triable issues of material fact as to the first three elements. On appeal, American

[1] We read the record favorably to Montgomery, although his position is undermined by his hyperbolic—if not disingenuous—statements set forth in his brief. For example, Montgomery's brief refers to "the continuous use of 'nigger'" as an instance of racial harassment. (Appellant's Br. at 24.) Yet his citations in support of this "fact" ultimately reveal that he heard the word used in his presence only once. American offers an affidavit from Rios confirming that Montgomery told her that he heard it only once and that he only assumed that it was directed toward him. The record in no way supports the statement of fact Montgomery submitted to the district court or the assertion he makes to this court in his brief. This is but one example of many.

fully develops only its arguments regarding the basis for employer liability. We find this issue dispositive.

For Montgomery to recover against American for the hostile work environment he alleges, he must show a basis for employer liability by proving either (1) that a supervisor participated in the harassment that created the hostile work environment or (2) that American was negligent in discovering or remedying harassment by his coworkers. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). Montgomery's only contention that a supervisor participated in harassment involved the conduct of a crew chief, Frank Dlugopolski. But in American's Auto Shop, crew chiefs are not "supervisors" as that term applies to racial harassment claims. In this context, "supervisor" is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties. As Montgomery concedes, crew chiefs are members of the union, not management. Further, the crew chiefs could not "affect the terms and conditions of [Montgomery's] employment." *Id*. While we have noted that not all individuals fit cleanly within "the two pigeonholes" of paradigmatic supervisor and paradigmatic coworker, *Doe v. Oberweis Dairy*, 456 F.3d 704, 716-17 (7th Cir. 2006), we easily classify Dlugopolski as a coworker. His occasional authority to oversee some aspects of Montgomery's work does not suffice to make him a supervisor. In fact, we have previously held that more extensive duties—such as the combination of directing or managing a plaintiff's activities, providing evaluation input to a plaintiff's supervisor, and training a plaintiff—do not necessarily suffice. *See*

*Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). Because Montgomery offered no evidence of harassment from *supervisors* at American, he has not established a material issue of fact as to American's strict liability for racial harassment.

Montgomery must, therefore, resort to the second method of proving American liable for the hostile work environment. To succeed, he must provide evidence that American "failed to have and enforce a reasonable policy for preventing harassment." *Oberweis Dairy*, 456 F.3d at 716. As a part of this showing, Montgomery must demonstrate that he made a concerted effort to inform American of the racial harassment he was allegedly experiencing or that the harassment was sufficiently obvious to put American on constructive notice. *Rhodes*, 359 F.3d at 507. But the record supports neither Montgomery's allegation of reporting nor American's constructive notice.

At all times relevant to this lawsuit, American had a published policy that proscribed racial harassment and provided multiple methods for employees to report harassing conduct, including speaking with supervisors, contacting a manager, or calling a hotline. Montgomery does not deny the existence of this policy, but instead contends that he was supposed to report racial harassment to his crew chief. While supervisor Shay did tell Montgomery to address any problems Montgomery experienced to the crew chiefs, Shay also told Montgomery to contact his immediate supervisor or Shay

directly if he was not satisfied with the crew chiefs' response. Moreover, Shay's instructions referred to general problems Montgomery might experience; they did not involve any discussion of racial harassment. Montgomery later mentioned to Rios and testified in his deposition that he intended to report his racial harassment concerns to supervisors Shay and Dave Brooks and manager Schaefer, thus showing his understanding that he needed to make his supervisors—not just crew chiefs—aware of his complaints. Regardless, we do not deem Montgomery's statements to Dlugopolski sufficient to inform American of his concerns, because it was unreasonable for Montgomery to believe that Dlugopolski—a union member and crew chief—was "the type of employee who could be expected to convey [his] complaints to someone who could stop the harassment." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998).

Upon an exhaustive review of the record, we agree with the district court that "[t]he evidence that Montgomery relies upon does not support his argument that he brought his concerns of racial harassment to the attention of his supervisors." *Montgomery v. American Airlines, Inc.*, 2008 WL 4671764, at *7 (N.D. Ill. Oct. 21, 2008). Montgomery contends that he "presented evidence that he explicitly complained about the racial harassment and racial discrimination" to Shay, Brooks, and Schaefer, (Appellant's Br. at 28), but he mischaracterizes the evidence in the record. Montgomery testified in his deposition that he did not report to Shay or Brooks that he believed his problems were based on his race. While Montgomery did address

racial concerns with Schaefer, the record shows that he did so only within the context of Montgomery's complaint about having to take the qualification test—an allegation relating to employment discrimination and not to harassment. The most favorable inference supported by the record is that Montgomery *intended* to inform his supervisors about his concerns of racial harassment, but did not because he subjectively felt unable to do so in the few instances where he sought an opportunity to report his problems. This inference does not suffice to create a triable issue of fact, as his fear of unpleasantness cannot excuse Montgomery from using the company's complaint mechanisms. *See Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir. 1999).

Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report—clearly and directly—nonobvious policy violations troubling him so that supervisors may intervene. *See Durkin v. City of Chicago*, 341 F.3d 606, 612-13 (7th Cir. 2003) (holding an employer will not be liable for alleged coworker harassment "when a mechanism to report the harassment exists, but the victim fails to utilize it."). What verbal complaints Montgomery did make to Shay, Brooks, and Schaefer were too vague to put American on notice of the racial harassment he now alleges. Montgomery complained of general unfairness in task assignments and of employee delinquency, but these complaints did not provide notice of any racial harassment concerns. Because Montgomery "unreasonably fail[ed] to take advantage of preventive or corrective opportunities," and American

consequently did not know about his concerns, American "cannot be held liable." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 770 (7th Cir. 2007).

Alternatively, Montgomery could have offered some evidence allowing a reasonable inference that supervisors at American knew of the alleged racial harassment. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). But by failing to develop the constructive notice argument on appeal, Montgomery waived any contention that the alleged racial harassment was sufficiently obvious to charge American with knowledge of the conduct.[2] Accordingly, "the law does not require [American] to do more than promote general anti-harassment policies and training." *Rhodes*, 359 F.3d at 507.

An employer can generally avoid liability for a hostile work environment if it promptly investigated complaints made by the plaintiff and acted to stop the harassing behavior. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009). As previously mentioned, American had the requisite policy in place. Rios began a thorough

---

[2] Montgomery's brief does state that "an employer such as [American] may be 'charged with constructive notice' when the harassment was sufficiently obvious." (Appellant's Br. at 27 (*citing Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1016 (S.D. Ind. 2004)). But a passing citation to non-binding authority is certainly a perfunctory and undeveloped argument, if it is any argument at all. Accordingly, Montgomery waived any argument about constructive notice that he may have had. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704-05 (7th Cir. 2010).

investigation immediately upon Montgomery's first proper notification of his racial harassment concerns, and "prompt investigation is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quotation marks omitted). Rios's actions indicate that American "took the harassment seriously and took appropriate steps to bring the harassment to an end." *Id.* Further, Schaefer had already responded to Montgomery's complaints about other employees' delinquency. Schaefer's immediate reactions to these allegations reinforce the conclusion that Montgomery failed to alert Schaefer to his concerns of racial harassment. Because it appears that American took reasonable steps to prevent future harms whenever Montgomery properly reported any concerns, American bears no liability under these circumstances. *See id.* at 637.

In summary, Montgomery failed to present any evidence that would allow a reasonable jury to impute liability to American even if Montgomery had proven that his working environment in the Auto Shop was hostile. As such, the district court did not err in granting summary judgment in favor of American on Montgomery's racial harassment claim.

## C. Racial Discrimination

Montgomery also claims that his demotion from his position as a probationary mechanic in American's Auto Shop to his original position as a Fleet Service Clerk was an act of racial discrimination against him. Montgomery may attempt to prove his racial discrimination case

under either the direct or indirect method. *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). As Montgomery appears to have addressed both methods of proof on appeal, we will examine his arguments under each method in turn.

### 1. Direct Method

In order to prove his case under the direct method, Montgomery must have provided direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial discrimination by American. *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Regardless of the type of evidence presented, Montgomery may avoid summary judgment only by presenting sufficient evidence to create a triable issue as to whether his demotion had a discriminatory motivation. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005). On appeal, Montgomery offers no evidence of any direct admission or demonstration of discriminatory intent. He instead asserts that the following bits of circumstantial evidence suffice to defeat summary judgment: (1) that he was the only African-American in the Auto Shop, (2) that he was the only probationary employee required to pass a tool inspection, (3) that he was the only probationary mechanic required to take and pass the qualification test, and (4) that he suffered incidents of harassment from his coworkers. He compares his case to *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 904 (7th Cir. 2006) ("There is no rich mosaic of circumstantial evidence of

retaliation in this case, but there is enough (though maybe barely enough) to preclude summary judgment."), suggesting that the evidence in his case is far stronger than the evidence we found to suffice in *Sylvester*.

The relevant circumstantial evidence in discrimination cases ordinarily consists of indicators showing what may be "the real motivating force for employment decisions." *Coffman*, 578 F.3d at 563. We have described "two general categories of circumstantial evidence: (1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systemically better treatment of employees outside the protected class." *Id.*

We first note that, as Montgomery contends he was alone in his protected group, the first category is clearly inapplicable here. We also note that Montgomery's allegations involving harassment all describe the conduct of coworkers, not supervisors—a point which distinguishes his circumstances from those in *Sylvester*. 453 F.3d at 905 (circumstantial evidence of *supervisors'* conduct sufficed to defeat summary judgment by allowing inference of retaliation). Montgomery then alleges only two incidents of "systemically better treatment" of non-African-American employees: that he was the only employee who had to pass the tool inspection and the qualification test. Even if these allegations are true, they do not constitute evidence allowing a jury to infer a discriminatory motive behind Montgomery's demotion. *See, e.g.*, *Coffman*, 578 F.3d at 563 ("She does

aver generally that the Department employed several short men who were never obligated to undergo driving evaluations, but this fact alone does little to show that men generally were treated differently by the Department."). Because Montgomery's proffered circumstantial evidence does not point directly to a discriminatory reason for American's action, Montgomery cannot survive summary judgment under the direct method of proof for his racial discrimination claim.

### 2. Indirect Method

The indirect method of proof requires Montgomery to introduce evidence demonstrating four elements to establish a prima facie case of and survive summary judgment on his racial discrimination claim: (1) that he was a member of a protected class, (2) that he was performing his job satisfactorily, (3) that he suffered an adverse employment action, and (4) that American treated a similarly situated individual outside Montgomery's protected class more favorably. *Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009). If Montgomery satisfied those elements, thus giving rise to an inference of discrimination, the burden would shift to American to identify a legitimate, nondiscriminatory reason for the action taken. *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). If American proffered a nondiscriminatory reason for returning Montgomery to his Fleet Service Clerk position, summary judgment would only be erroneous if Montgomery produced evidence that the proffered reason was a pretext for racial discrimination. *Id.*

For purposes of this appeal, American does not contest that Montgomery is a member of a protected class or that his transfer back to the Fleet Service Clerk position constituted an adverse employment action. American contends, however, that Montgomery cannot satisfy the other two prongs of the prima facie case. For his part, Montgomery contends that he may proceed to the pretext inquiry because he has alleged that American's expectations were inherently discriminatory. We have previously noted that "[w]hen a plaintiff *produces evidence* sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner . . . the second and fourth prongs merge—allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (*quoting Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)) (emphasis added). Montgomery does allege that American's expectations varied with race, but we decline to merge the second and fourth prongs and proceed to the pretext inquiry because he does not support that allegation with any actual evidence of disparate application. Montgomery may not "put[] the pretext cart before the prima facie horse" by substituting allegations for proof. *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). "The prima facie case must be established and not merely incanted." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). Montgomery must still come forward with sufficient evidence of the disparate treatment of similarly situated individuals in order to satisfy his prima facie case. *See Elkhatib*, 493 F.3d at 831.

After our review of the record in this case, we agree with the district court that Montgomery did not produce evidence to establish a prima facie case of racial discrimination. Montgomery alleges both that he was required to take the qualification test when other non-African-American probationary mechanics were not and also that the test itself was prejudicially administered to him. He supports neither allegation with evidence sufficient to defeat American's motion for summary judgment.

As to the first allegation, Montgomery asserts that three individuals—Nguyen, Hilt, and Romano—were probationary mechanics at the same time as him, that their probationary periods also ended after Schaefer had assumed responsibility of the Auto Shop, and that these contemporaries were not required to take the qualification exam to continue as fully vested Auto Shop mechanics. Montgomery contends that the three mechanics were similarly situated to him—given that they were in the same job, subject to the same CBA, subordinate to the same supervisors, and had comparable qualifications—but that their treatment was preferential to his own. If the record supported Montgomery's assertions regarding Nguyen, Hilt, and Romano, he likely would have established a prima facie case of racial discrimination. But the record does not come close to supporting those conclusions.

In order to meet the fourth prong of the prima facie case, the plaintiff must demonstrate that the putative similarly situated employees were "directly comparable to the plaintiff in all material respects." *Patterson v. Ind.*

*Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009). None of the three probationary mechanics named by Montgomery was similarly situated to, but treated differently from, Montgomery.

First, the record shows that Nguyen worked as a probationary mechanic in the Auto Shop at some time during Montgomery's probation but that Nguyen completed his probationary period before Schaefer assumed control over the Auto Shop and began enforcing the CBA's qualification test protocol. Because the CBA requires that a probationary mechanic become a fully vested mechanic without testing if he has not been tested within 180 days, and because Schaefer was not available to enforce the testing requirement during Nguyen's 180 days of probation, the record establishes that Nguyen was not situated similarly to Montgomery. *See Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (holding that the majority of the plaintiff's coworkers were not similarly situated to the plaintiff because enforcement of the employer's disciplinary policy "depended on who was managing the store, and all but two of the sixteen violations that [the plaintiff] cites occurred either before or after the tenure of" the manager who disciplined the plaintiff).

Second, although Romano was also a probationary mechanic at some point while Montgomery was in the Auto Shop, Romano was not tested because his probationary time was erroneously calculated due to an earlier layoff and reinstatement. TWU intervened to prevent Romano from being tested in contravention of

the CBA's 180-day provision. Montgomery does not refute these facts, but rather asserts that he didn't know why Romano did not take the test and that Romano had told him, "They just let me in." (Montgomery Dep. at 302:15-20.) This testimony in no way refutes the fact that Romano was not situated similarly to Montgomery.

Finally, Montgomery testified that he thought Hilt had not yet taken his test by the time Schaefer assumed management responsibilities over the Auto Shop. He provides no evidence to support this contention other than his own belief, for which he demonstrates no foundation. We acknowledge that uncorroborated, self-serving testimony may suffice to prevent summary judgment in some circumstances, *Berry*, 618 F.3d at 691, but Montgomery's stated beliefs cannot create genuine issues of material fact when those beliefs lack a foundation of personal knowledge. Accordingly, the record does not indicate that Hilt was situated similarly to, but treated differently from, Montgomery.

Montgomery makes a second allegation under the indirect method—that the test itself was administered to him in an illegitimate and prejudicial manner. He claims test administrator Helton "harbored an overt discriminatory animus against" him. (Appellant's Br. at 22.) We have previously held that "an employer's use of subjective criteria may leave it more vulnerable to a finding of discrimination, when a plaintiff can point to some objective evidence indicating that the subjective evaluation is a mask for discrimination." *Sattar v. Motorola*,

*Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). But Montgomery again fails to provide evidence supporting his conclusions about Helton's discriminatory animus. Most notably, Montgomery testified in his deposition that he had never met Helton prior to the qualification test. Further, both Wells—who helped administer the qualification test—and union observer Pacenti agreed that Montgomery had simply failed the test and that Helton had been fair and actually lenient.

American and Montgomery dispute the appropriate method of administering the qualification test, including the number and scope of questions, the number of questions allowed to be missed, and its permissible duration. The district court carefully reviewed the record and correctly found that Montgomery failed to provide appropriate evidence to refute each of American's contentions regarding proper test administration. *Montgomery*, 2008 WL 4671764, at *13-14. But even if Montgomery produced sufficient evidence to dispute these facts, we find that they are immaterial and thus irrelevant to our analysis here. *See Severn*, 129 F.3d at 427.

What Montgomery needed to prove was that the exam was unfairly administered to him in comparison to other test takers. *See Perez v. Illinois*, 488 F.3d 773, 779 (7th Cir. 2007). Montgomery provided only conclusory accusations about the test's relative difficulty and no evidence of how the test had been administered to other candidates, let alone that any alleged variation was based on racial discrimination. He did not dispute that he was allowed more than adequate time to answer the questions

presented, and he presented no evidence to refute the collective conclusion of Helton, Wells, and Pacenti that the test was fairly administered.

Because he has neither shown that similarly situated employees outside of his protected class were treated more favorably than he nor provided evidence that American's expectations differed based upon race, Montgomery has failed to establish a prima facie case of racial discrimination under the indirect method. American nevertheless proffered a legitimate reason for Montgomery's demotion to his former Fleet Service Clerk position: Montgomery failed his tool inspection and qualification test, both of which the CBA requires of probationary employees. Montgomery acknowledged that Schaefer's sole basis for demoting him was his alleged failure of the exam. The district court chose to continue its analysis, assuming for argument's sake that Montgomery had satisfied his burden to establish a prima facie case. We find, as the district court did, that Montgomery provided no evidence that American's proffered reason was pretextual.

To demonstrate pretext, Montgomery "must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent." *Stockwell*, 597 F.3d at 901. Montgomery contends that American's proffered reason was a lie, but he never develops the argument by providing a single allegation of deception or false testimony, let alone any evidence supporting any such allegation. He neither disputes that American administered the tool inspection and qualification test because the CBA

so required nor presents evidence that American's reasons for Nguyen and Romano not taking the qualification test were pretextual. Because Montgomery failed to specifically address and refute the facts supporting American's proffered reason, he cannot succeed in demonstrating pretext. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 845 (7th Cir. 1996). To demonstrate pretext, Montgomery "must show that [American] did not honestly believe in the reasons it gave for terminating [him]." *Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 478-79 (7th Cir. 2010). He made no attempt to do so.

In summary, Montgomery failed to establish a prima facie case of racial discrimination. Even if he had succeeded in doing so, Montgomery did not establish a triable issue of fact as to whether American's reasons for demoting him were merely pretextual. Accordingly, we hold that the district court correctly granted summary judgment in favor of American on Montgomery's racial discrimination claim.

### III. CONCLUSION

We find that Montgomery has not produced evidence to create a genuine issue of material fact regarding a vital element in both his hostile work environment and racial discrimination claims. Because no reasonable jury could find in Montgomery's favor, we AFFIRM the district court's grant of summary judgment in favor of American on all counts.